IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

In re:                                          )
                                                )
CORBIN PARK, L.P.                               )          Case No.  10-20014
                                                )
            Debtor.                             )

## NOTICE OF AUCTION RESUULTS AND SALE CONTRACT

NOTICE IS HEREBY GIVEN that an auction was held and concluded on October 24, 2011.  Aspen Square, Inc. was the winning bidder.  A copy of the final Agreement of Purchase and Sale is attached hereto.

LENTZ CLARK DEINES PA

s/ Jeffrey A. Deines
Carl R. Clark, KS #11411
Jeffrey A. Deines, KS # 20249
9260 Glenwood
Overland Park, KS  66212
(913) 648-0600
(913) 648-0664 Fax
cclark@lcdlaw.com
jdeines@lcdlaw.com
Attorneys for Debtor

CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2011 a true and correct copy of the above and foregoing Notice was electronically filed with the court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

s/ Jeffrey A. Deines
Jeffrey A. Deines

# AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS

BY AND BETWEEN

## CORBIN PARK, LP, DEBTOR IN POSSESSION
A Delaware limited partnership

AS SELLER

AND

## ASPEN SQUARE, INC.,
a Kansas corporation,

AS BUYER

RELATING TO THE

## Uncompleted Corbin Park
## Open Air Life Style Center
## Overland Park, KS

DATED AS OF

October 24, 2011

21479230\V-1

**TABLE OF CONTENTS**

| SECTION | | | | PAGE |
|---|---|---|---|---|
| 1. | Definitions | | | 1 |
| 2. | Purchase and Sale | | | 5 |
| 3. | Purchase Price | | | 5 |
| | 3.1 | Deposit | | 5 |
| | 3.2 | Cash Balance | | 6 |
| 4. | Escrow | | | 6 |
| 5. | Cancellation Fees and Expenses | | | 6 |
| 6. | Deliveries to Escrow Holder | | | 6 |
| | 6.1 | By Seller | | 6 |
| | 6.2 | By Buyer | | 7 |
| | 6.3 | By Buyer and Seller | | 7 |
| 7. | Condition of Title | | | 8 |
| 8. | Conditions to the Close of Escrow | | | 8 |
| | 8.1 | Conditions Precedent to Buyer's Obligations | | 8 |
| | 8.2 | Conditions Precedent to Seller's Obligations | | 9 |
| | 8.3 | Bankruptcy Court Approval | | 9 |
| | | 8.3.1 | Approval | 9 |
| | | 8.3.2 | Sale Order | 9 |
| | | 8.3.3 | Appeals | 10 |
| | | 8.3.4 | Buyer Right to Review and Comment On Motions and Orders | 10 |
| 9. | Due Diligence | | | 10 |
| 10. | Property "As-Is" | | | 10 |
| | 10.1 | NO SIDE AGREEMENTS OR REPRESENTATIONS; AS-IS PURCHASE | | 10 |
| | 10.2 | RELEASE | | 13 |
| | 10.3 | Disclosures; Specific Acknowledgment Regarding Condition of Property | | 14 |

| 11. | | Title Insurance | 14 |
|---|---|---|---|
| 12. | | Costs and Expenses | 14 |
| 13. | | Prorations: | 14 |
| | 13.1 | Taxes and Assessments | 14 |
| | 13.2 | Rents and Deposits | 14 |
| | 13.3 | Utilities | 14 |
| 14. | | Disbursements and Other Actions by Escrow Holder | 15 |
| | 14.1 | Funds | 15 |
| | 14.2 | Recording | 15 |
| | 14.3 | Delivery of Documents to Buyer or Seller | 15 |
| 15. | | Joint Representations and Warranties | 15 |
| | 15.1 | Authority | 15 |
| | 15.2 | Actions | 15 |
| | 15.3 | Due Execution | 16 |
| | 15.4 | Valid and Binding | 16 |
| | 15.5 | Prohibited Person | 16 |
| 16. | | Seller's Pre-Closing Covenants | 16 |
| 17. | | Condemnation and Destruction | 17 |
| | 17.1 | Eminent Domain or Taking | 17 |
| | 17.2 | Damage or Destruction | 17 |
| 18. | | Hazardous Substances | 18 |
| | 18.1 | Definitions | 18 |
| | 18.2 | Notices Regarding Hazardous Substances | 18 |
| | 18.3 | Environmental Release and Indemnity | 18 |
| 19. | | Transportation Development District | 19 |
| 20. | | Notices | 19 |
| 21. | | Broker | 19 |
| 22. | | Entry | 19 |

| 23. | | Legal and Equitable Enforcement of this Agreement | 20 |
|---|---|---|---|
| | 23.1 | Waiver of Specific Performance and Lis Pendens | 20 |
| | 23.2 | Default by Buyer | 20 |
| 24. | | Assignment | 20 |
| 25. | | Miscellaneous | 20 |
| | 25.1 | Counterparts | 20 |
| | 25.2 | Partial Invalidity | 20 |
| | 25.3 | Possession of the Property | 20 |
| | 25.4 | Waivers | 20 |
| | 25.5 | Successors and Assigns | 21 |
| | 25.6 | Professional Fees | 21 |
| | 25.7 | Entire Agreement | 21 |
| | 25.8 | Time of Essence | 21 |
| | 25.9 | Construction | 21 |
| | 25.10 | Governing Law | 21 |
| | 25.11 | Wear and Tear | 21 |
| | 25.12 | No Recordation | 21 |
| | 25.13 | Financing | 21 |
| | 25.14 | Survival | 22 |
| | 25.15 | Not an Offer; Last Date for Submission | 22 |
| | 25.16 | Third Party Beneficiary | 22 |

## EXHIBITS

EXHIBIT A:  LEGAL DESCRIPTION
EXHIBIT B:  FORM OF DEED
EXHIBIT C:  FIRPTA AFFIDAVIT
EXHIBIT D:  BILL OF SALE
EXHIBIT E:  ASSIGNMENTS & ASSUMPTIONS

Case 10-20014    Doc# 588    Filed 10/25/11    Page 5 of 42

## AGREEMENT OF PURCHASE AND SALE
## AND JOINT ESCROW INSTRUCTIONS

THIS AGREEMENT OF PURCHASE AND SALE AND JOINT ESCROW INSTRUCTIONS ("**Agreement**") is made and entered into as of October 24, 2011 (the "**Effective Date**"), by and between **Corbin Park, LP, Debtor in Possession,** a Delaware limited partnership ("**Seller**") and **Aspen Square, Inc.**, a Kansas corporation ("**Buyer**").

## Recitals

A. Seller is the debtor-in-possession in a case (the "**Chapter 11 Case**") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the District of Kansas (Case No. 10-20014).

B. Seller desires to sell to Buyer, and Buyer desires to purchase, the Property (as defined below) free and clear of all interests, liens, claims and encumbrances pursuant to Sections 363 and 365 of the Bankruptcy Code on the terms and conditions set forth in this Agreement.

C. The transactions contemplated by this Agreement will be implemented through the filing of one or more motions seeking the entry of orders of the Bankruptcy Court approving the terms of the sale of the Property pursuant to Section 363 of the Bankruptcy Code.

Buyer and Seller agree as follows:

**1. Definitions**: For the purposes of this Agreement the following terms will be defined as follows:

(a) "**Actual Knowledge of Seller**": Actual Knowledge of Seller means and is limited to the actual knowledge of the General Partner without having conducted any independent inquiry or inspection.

(b) "**Assignment and Assumption**": Shall have the meaning given thereto in Section 6 hereof.

(c) "**Assumed Agreements**": Shall mean (i) the Lease dated October 8, 2008 by and between J.C. Penney Properties, Inc., as lessor, and Seller (as successor to 135 Metcalf, L.L.C. and State Line, LLC) for the Shop Space as defined therein, (ii) the Joint Holding Instructions dated October 8, 2008 from J.C. Penney Properties, Inc. and Seller (as successor to 135 Metcalf, L.L.C. and State Line, LLC) to Hartman, Simons, Spielman & Wood, LLP, and (iii) the Amendment to Joint Holding Instructions dated October 8, 2009 from J.C. Penney Properties, Inc. and Seller to Hartman, Simons, Spielman & Wood, LLP.

(d) "**Bank**": Shall mean and refer to Bank of America, N.A.

(e) "**Bankruptcy Court**": Shall mean and refer to the U.S. Bankruptcy Court, District of Kansas.

21479230\V-1

(f)     **"Bankruptcy Court Approval"**: Shall have the meaning given thereto in Section 8.3 hereof.

(g)     **"Bill of Sale"**: Shall have the meaning given thereto in Section 6 hereof.

(h)     **"Broker"**: Broker shall mean Seller's Broker, CB Richard Ellis Inc. which shall receive a Seller paid fee per a separate agreement between Seller and Broker.

(i)     **"Business Day"**: Business Day shall mean any day other than a Saturday, Sunday or holiday observed by the United States government, New York Stock Exchange or the Federal Reserve.

(j)     **"Closing Date"**: The Closing Date shall occur on the first business day following the date that the Bankruptcy Court Approval becomes final and not subject to appeal, or at such other date as the parties may mutually agree.

(k)     **"Closing"** and **"Close of Escrow"**: Closing and Close of Escrow are terms used interchangeably in this Agreement. The Closing or the Close of Escrow will be deemed to have occurred when the Deed is recorded in the official records of the county in which the Property is located.

(l)     **"Contracts"**: Contracts shall mean any contracts or agreements that benefit or burden the Real Property.

(m)     **"Cure Costs"**: Shall mean those monetary obligations of Seller, if any, that must be paid or otherwise satisfied to cure all of Seller's defaults under the Assumed Agreements at the time of the assumption thereof and assignment to Buyer as provided hereunder.

(n)     **"Deed"**: Shall have the meaning given thereto in Section 6 hereof.

(o)     **"Deposit"**: The Deposit of $500,000 shall be placed into Escrow by Buyer on the Opening of Escrow as defined in Section 4. The Deposit shall be refunded to Buyer or transferred to Seller as more particularly provided herein.

(p)     **"Effective Date"**: The Effective Date is the date first set forth above.

(q)     **"Environmental Audit"**: Shall have the meaning given thereto in Section 18 hereof.

(r)     **"Environmental Law"**: Shall have the meaning given thereto in Section 18 hereof.

(s)     **"Environmental Report(s)"**: Means that certain Phase I Environmental Site Assessment prepared by QORE, Inc. and dated September 5, 2008.

(t)     **"Escrow"**: Shall have the meaning given thereto in Section 4 hereof.

- 2 -

21479230.V-1

(u)  "**Escrow Holder**":  The Escrow Holder is First American Title Insurance Company, 911 Main, Suite 2500, Kansas City, MO 64105, Attention: Todd G. Jones, Esq.

(v)  "**Exhibits**":  Exhibits means the following, each of which is attached hereto and incorporated herein by this reference:

>  Exhibit A -  Legal Description
>  Exhibit B -  Form of Deed
>  Exhibit C -  FIRPTA Affidavit
>  Exhibit D -  Bill of Sale
>  Exhibit E -  Assignment and Assumption

(w)  "**FIRPTA Certificate**":  Shall have the meaning given thereto in Section 6 hereof.

(x)  "**General Partner**":  General Partner shall mean the general partner(s) of Seller.

(y)  "**Hazardous Substance**":  Shall have the meaning given thereto in Section 18 hereof.

(z)  "**Leases**":  Leases shall mean the leases, if any, that presently affect the Real Property.

(aa)  "**Improvements**":  All improvements and fixtures situated on the Real Property.

(bb)  "**Notices**":  will be sent as follows to:

| | |
|---|---|
| Seller: | Corbin Park, LP, Debtor in Possession<br>c/o 9260 Glenwood<br>Overland Park, KS 66212<br>Attn: Jodi Johnson<br>Telephone: 913.648.0660<br>Email: 913.648.0664 |
| with a copy to: | Jeffrey A. Deines, Esq.<br>Lentz Clark Deines PA<br>9260 Glenwood<br>Overland Park, KS 66212<br>Phone: 913.648.0660<br>Telecopy No.: 913.648.0664 |
| with a further copy by<br>e-mail PDF to: | leslie.andren@bankofamerica.com and<br>jtrad@lewisrice.com |

- 3 -

|                 |                                                                                                                                                                                          |
| --------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| Buyer:          | Aspen Square, Inc.<br>7242 West 121st Street<br>Overland Park, KS 66213<br>Attention: Mr. Mike Schlup<br>Phone: 913-499-1926<br>Telecopy No.: 913-499-1913                          |
| with a copy to: | SNR Denton US LLP<br>4520 Main Street, Suite 1100<br>Kansas City, MO 64111<br>Attn: John L. Snyder, Esq.<br>Telephone: 816-460-2668<br>Telecopy No.: _____ 816-531-7545                  |
| Escrow Holder:  | First American Title Insurance Company<br>911 Main, Suite 2500<br>Kansas City, MO 64105<br>Attn: Todd G. Jones, Esq.<br>Telephone: 816-421-7905<br>Telecopy No.: _____ 816-493-6334      |

(cc)     **"Opening of Escrow"**: Shall have the meaning given thereto in Section 4 hereof.

(dd)     **"Permitted Exceptions"**: Shall have the meaning given thereto in Section 7 hereof.

(ee)     **"Personal Property"**: The equipment, furniture and fixtures and other personal property, if any, which are actually owned by Seller and located on the Real Property, Seller's marketing brochures and similar materials, and Seller's intellectual property including copyrights, internet domain rights and related website rights, trademarks and trade names used in connection with the Real Property.

(ff)     **"Property"**: Collectively, (i) the Real Property, (ii) the Improvements, (iii) the Personal Property, (iv) the TDD Rights, (v) the Leases, (vi) the Contracts, and (vii) the Warranties.

(gg)     **"Purchase Price"**: The Purchase Price for the Property is EIGHT MILLION ONE HUNDRED THOUSAND DOLLARS ($8,100,000.00), of which $3,975,000 is allocated by the parties to the Real Property and Improvements, $18,000 to the Personal Property, Contracts and Warranties, and $4,107,000 to the TDD Rights.

(hh)     **"Real Property"**: The improved real estate being that certain uncompleted approximately 1.1 million square foot Corbin Park Open Air, Life Style Center located at the intersection of 135th Street and Metcalf Avenue in Overland Park, County of Johnson, State of Kansas owned by Corbin Park, LP, Debtor in Possession and being legally

- 4 -

described in Exhibit A attached hereto and any existing Leases (if any), together with all easements, entitlements (to the extent transferable) and appurtenances thereto.

(ii) "**Reporting Person**": Shall have the meaning given thereto in Section 6.3 hereof.

(jj) "**Seller Party/Parties**": Shall have the meaning given thereto in Section 10.2 hereof.

(kk) "**TDD Rights**": Shall have the meaning given thereto in Section 19 hereof.

(ll) "**Title Company**": The Title Company is First American Title Company.

(mm) "**Title Policy**": Shall have the meaning given thereto in Section 11 hereof.

(nn) "**Warranties**": Warranties shall mean warranties that benefit the Real Property or Personal Property, if any.

**2. Purchase and Sale:** Upon and subject to the terms and conditions set forth in this Agreement, Seller agrees to sell to Buyer and Buyer agrees to buy from Seller the Property, together with all easements, entitlements (to the extent transferable) and appurtenances thereto. In consideration of Seller's sale of the Property to Buyer, Buyer will (a) pay to Seller the Purchase Price at the Closing, and (b) perform all of Buyer's other obligations specifically assumed by Buyer as of Closing, plus any indemnities set forth herein which survive termination of this Agreement (such as Section 21 below). Except as specifically set forth herein with respect to the performance by Buyer of its obligations arising hereunder or under the Leases and Contracts and relating to periods from and after the time of Closing, Buyer does not and will not assume any liability or obligation of any kind of Seller, or any obligation relating to the business of Seller or the use of the Property or performance by Seller under the Leases and Contracts prior to the time of Closing, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, or otherwise. Notwithstanding the foregoing, at the Closing, Seller shall assume and assign to Buyer the Assumed Agreements. If there exists on the Closing Date any default related to an Assumed Agreement, Buyer shall be responsible for payment of the Cure Costs pursuant to Section 365(a) of the Bankruptcy Code as a condition to the assumption and assignment of such Assumed Agreement. At the Closing, Buyer shall pay or provide funds to Seller, by wire transfer of immediately available U.S. funds, in an amount sufficient to pay the Cure Costs. Buyer shall be responsible for any and all costs and expenses necessary in connection with providing adequate assurance of future performance with respect to any of the Assumed Agreements under Section 365 of the Bankruptcy Code.

**3. Purchase Price:** The Purchase Price for the Property will be paid as follows:

3.1 Deposit. Upon the Opening of Escrow (as defined in Section 4), Buyer will deliver to Escrow Holder by confirmed wire transfer in same day funds, the initial $500,000 Deposit. The Escrow Holder shall deposit the Deposit in an interest-bearing account for the benefit of Buyer. If the Closing takes place as provided herein, then the Deposit shall be credited against the Purchase Price pursuant to Section 3.2 and paid to the Seller at the Closing. If this

- 5 -

21479230\V-1

Agreement is terminated by Buyer: (i) pursuant to Section 23.1 based on Seller's material default or due to failure to obtain the Bankruptcy Court Approval within twenty (20) days from the Effective Date (the "Outside Approval Date"), then the Escrow Agent shall promptly return the Deposit to the Buyer. If this Agreement is terminated by Seller pursuant to Section 23.2 hereof, or by either party for any other permitted reason, then the Deposit shall be retained by the Seller. Seller acknowledges and agrees that Escrow Holder shall pay any forfeited Deposit to the Bank to be applied to its loan.

       3.2    <u>Cash Balance</u>. No later than such time as is required by Escrow Holder or otherwise in order for the Closing to occur by the Closing Date, Buyer will deposit into Escrow the Purchase Price (less the Deposit and plus or minus any closing adjustments) by confirmed wire transfer of funds in same day funds.

**4.**    **Escrow:** Immediately upon execution of this Agreement, Buyer and Seller will open an escrow (the "**Escrow**") with the Escrow Holder by delivering to Escrow Holder a fully executed copy of this Agreement and Buyer will deliver the $500,000 Deposit (the "**Opening of Escrow**"). The purchase and sale of the Property will be completed through the Escrow. Except for release of the Deposit to Bank as contemplated in Section 3.1 above for which no additional instruction shall be requested or required, Buyer and Seller agree to execute any additional instructions reasonably required by the Escrow Holder. If there is a conflict between any printed escrow instructions and this Agreement, the terms of this Agreement will govern.

**5.**    **Cancellation Fees and Expenses:** If the Closing does not occur at the time and in the manner provided in this Agreement because of the default of one of the parties, the non-defaulting party has the right to cancel the Escrow by written notice to the defaulting party and to the Escrow Holder. All costs of cancellation, if any, will be paid by the defaulting party.

**6.**    **Deliveries to Escrow Holder:**

       6.1    <u>By Seller</u>. On or prior to the Closing Date, Seller will deliver or cause to be delivered to Escrow Holder the following items:

       (a)    A Special Warranty Deed ("**Deed**"), generally in the form attached to this Agreement as **Exhibit B**, duly executed and acknowledged by Seller and in recordable form, and approved by the Bankruptcy Court, conveying the Property to Buyer.

       (b)    A Transferor's Certificate of Non-Foreign Status generally in the form attached to this Agreement as **Exhibit C** ("**FIRPTA Certificate**") properly executed by Seller.

       (c)    An executed bill of sale ("**Bill of Sale**") generally in the form attached to this Agreement as **Exhibit D**.

       (d)    Two (2) executed counterpart copies of assignment and assumption of Contracts and Warranties ("**Assignment and Assumption**") generally in the form attached to this Agreement as **Exhibit E**.

       (e)    At Buyer's option, either (i) an executed assignment and assumption agreement for the TDD Rights being transferred under Section 19 (the "**TDD Assignment**") in

- 6 -

Case 10-20014   Doc# 588   Filed 10/25/11   Page 11 of 42

form and substance acceptable to Seller, Buyer and the City or (ii) amended and restated documentation with respect to the TDD upon terms and conditions, and in form and substance, acceptable to Buyer and the City; provided, however, that Buyer understands that it is Buyer's responsibility to obtain the City's and all other necessary parties' approvals to the transfer of the TDD Rights as described in Section 19 and that the TDD Assignment may be ineffective to transfer any rights until such approvals are obtained.

(f) An assignment of any and all rights as developer and declarant with respect to the Property and any leases, contracts, declarations, supplemental or separate agreements to any declarations, and/or agreements which benefit or burden the Property, including, without limitation, all rights to enforce covenants against tenants and adjacent property owners which affect the Property.

(g) An assignment by which the Bank waives and releases and Seller transfers to Buyer all of their respective rights, obligations and interests with respect to architectural and engineering drawings and designs that relate to the Property.

(h) A closing settlement statement.

(i) A court order from the Bankruptcy Court under Section 363 of the Bankruptcy Code approving the transactions contemplated in this Agreement.

6.2 By Buyer. On or prior to the Closing Date, Buyer will deliver or cause to be delivered to Escrow Holder the following items:

(a) The balance of the Purchase Price in accordance with Section 3.

(b) The amount due Seller, if any, after the prorations are computed in accordance with Section 13.

(c) Such corporate, limited liability company or partnership resolutions, certificates of good standing and/or other corporate, limited liability company or partnership documents relating to Buyer as are reasonably required by Seller in connection with this transaction.

(d) Two (2) executed counterparts of the Assignment and Assumption.

(e) Two (2) executed counterparts of the TDD Assignment, provided, however, that Buyer understands that it is Buyer's responsibility to obtain the City's and all other necessary parties' approvals to the transfer of the TDD Rights as described in Section 19 and that the TDD Assignment may be ineffective to transfer any rights until such approvals are obtained.

(f) A certificate of value to accompany recording of the Deed.

(g) A closing settlement statement.

6.3 By Buyer and Seller. Buyer and Seller will each deposit such other instruments consistent with this Agreement as are reasonably required by Escrow Holder or otherwise

- 7 -

required to close escrow. In addition, Seller and Buyer hereby designate Escrow Holder as the **"Reporting Person"** for the transaction pursuant to Section 6045(e) of the Internal Revenue Code.

**7. Condition of Title**: At the Close of Escrow, fee simple title to the Property will be conveyed to Buyer by Seller by the Deed, subject only to the following matters (**"Permitted Exceptions"**):

(a) a lien for real property taxes and assessments, water charges, sewer assessments and each other lien or encumbrance of an indefinite or unascertainable amount, in each case not then delinquent;

(b) all matters of record as shown in the Title Policy or otherwise of record, but in any event free and clear of all other liens, claims and encumbrances as set forth in the Bankruptcy Court Approval; provided Seller hereby states that there are no Leases which are binding upon or affect the Property;

(c) matters affecting the condition of title to the Property created by or with the written consent of Buyer;

(d) any matters which would be shown by an inspection, a survey of the Property or by inquiry of persons in possession of the Property; and

(e) all applicable building and zoning ordinances.

The parties agree, which agreement shall survive Closing, that (i) except as specifically provided in the Deed, Seller makes no express or implied warranties regarding the condition of title to the Property, and (ii) Buyer shall rely on the Title Policy and the Bankruptcy Court Approval for protection against any title defects and shall not bring any action against Seller for any title matters.

**8. Conditions to the Close of Escrow**:

8.1 Conditions Precedent to Buyer's Obligations. The Close of Escrow and Buyer's obligations with respect to this transaction are subject to the following conditions precedent, which must be satisfied not later than the Closing Date: (a) Seller's delivery to the Escrow Holder on or before the Closing Date, of the items described in Section 6.1, (b) Seller having duly performed each and every agreement to be performed by Seller hereunder, and Seller's representations, warranties and covenants set forth in this Agreement, continuing to be true and correct as of the Closing Date, and (c) this Agreement and the sale of the Property to Buyer shall have been approved by the Bankruptcy Court, in the manner set forth in Section 8.3 below. The conditions set forth in this Section 8.1 are solely for the benefit of Buyer and, except for the provisions of Section 8.1(c), may be waived by Buyer, with such waiver to be in writing delivered to Seller. If any conditions are not satisfied on or before the date specified, and Buyer has not waived the unsatisfied conditions, Seller will not be deemed to be in default and Buyer's sole remedy will be to terminate this Agreement, in which case Buyer shall be entitled to a refund of the Deposit.

- 8 -

Case 10-20014   Doc# 588   Filed 10/25/11   Page 13 of 42

8.2 Conditions Precedent to Seller's Obligations. The Close of Escrow and Seller's obligations with respect to this transaction are subject to the following conditions precedent, which must be satisfied no later than the Closing Date: (a) Buyer's delivery to Escrow Holder on or before the Closing Date, of the Purchase Price and the other items described in Section 6.2, (b) Buyer having duly performed each and every agreement to be performed by Buyer hereunder, and Buyer's representations, warranties and covenants set forth in this Agreement, continuing to be true and correct as of the Closing Date, and (c) this Agreement and the sale of the Property to Buyer shall have been approved by the Bankruptcy Court, in the manner set forth in Section 8.3 below. The conditions set forth in this Section 8.2 are solely for the benefit of Seller and, except for the provisions of Section 8.2(c), may be waived by Seller, with such waiver to be in writing delivered to Buyer.

### 8.3 Bankruptcy Court Approval.

8.3.1 Approval. Each party's obligations under this Agreement are subject to obtaining a final and non-appealable order from the Bankruptcy Court approving this transaction and all its terms (the "Bankruptcy Court Approval"), having jurisdiction over Seller's bankruptcy proceedings. Seller shall file a motion with the Bankruptcy Court to (i) approve this Agreement and the sale to Buyer, without further bidding by other parties, and (ii) obtain entry by the Bankruptcy Court of a proposed sale order (the "Sale Order") which is reasonably acceptable to Buyer and Bank, including the attachment of the liens of Bank to the sale proceeds. Seller and Bank will jointly submit the motion for the approval of this Agreement and the sale to Buyer. Buyer will prepare the initial draft of the Sale Order, subject to approval by Seller, the Bank and the Bankruptcy Court. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such court as is applicable. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court, or any defense based on inconvenient forum in connection therewith.

8.3.2 Sale Order. The Sale Order shall provide, among other things, findings and orders that: (i) adequate notice of the Seller's motion to sell the Property outside of the ordinary course of Seller's business and to assume and assign the Leases has been given to all parties entitled thereto, (ii) Seller is authorized to consummate the transactions contemplated by this Agreement and to perform any other act that is necessary or appropriate for the consummation of the transfer of the Property, (iii) the Property shall be conveyed and delivered to Buyer at the Closing free and clear of all liens, claims and encumbrances (including, without limitation, any successor liability claims, but excluding Permitted Encumbrances), (iv) the Property shall be conveyed and delivered to Buyer at the Closing free and clear of all lawsuits (including lis pendens) affecting the Property, including, without limitation, that certain lawsuit filed by Grier Metcalf, LLC and that certain lawsuit filed by Brown Commercial Construction Company, Inc., provided that the underlying agreements of record related to such lawsuits shall be Permitted Encumbrances, (v) Buyer has acted in "good faith" in connection with the

- 9 -

Case 10-20014   Doc# 588   Filed 10/25/11   Page 14 of 42

transactions contemplated in this Agreement, as provided in Section 363(m) of the Bankruptcy Code, and all conditions and terms of Section 363(l) of the Bankruptcy Code and the Bankruptcy Rules that are applicable thereto have been satisfied, and (vi) any commissions or fees due to Seller's broker shall be paid out of the net proceeds of the sale of the Assets. Seller shall use reasonable efforts to obtain the Bankruptcy Court's expedited entry of a Sale Order on or before October 31, 2011.

8.3.3    Appeals. In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer within two (2) Business Days a copy of the related notice of appeal or order of stay or application for reconsideration. Seller also shall provide Buyer with copies of any other or further notice of appeal, motion or application filed in connection with any appeal, motion or application filed in connection with any appeal from or application for reconsideration of either of such order and any related briefs. Seller shall take all steps as may be reasonable and appropriate to defend against any such appeal, petition or motion and to use its reasonable efforts to obtain an expedited resolution of any such appeal; provided, however, that nothing in this Agreement shall preclude the parties thereto from consummating the transactions contemplated herein if the Sale Order has been entered and has not been stayed.

8.3.4    Buyer Right to Review and Comment On Motions and Orders. The motion and proposed Sale Order which are submitted to the Bankruptcy Court in connection with the purchase of the Property shall be prepared at the expense of Seller and Seller shall not make any motions or filings relating to the Property, or the Sale Order unless and until such motions or filings have been previously provided to Buyer and Buyer has had the opportunity to comment on the same. Notwithstanding the foregoing, Seller shall not be obligated to accept any comments from Buyer and the ultimate form of the motion and Sale Order shall be under Seller's control.

9.    **Due Diligence:** Buyer acknowledges that it was given the opportunity to, and did in fact, conduct all due diligence that it desired in connection with its purchase of the Property, and this sale shall not be contingent on any further due diligence on Buyer's part. Any information or documents that Seller made available to Buyer was for informational purposes only and without representation or warranty as to the validity, accuracy or completeness of the contents of such materials. Buyer covenants and agrees that it will not rely on such documents and information and has conducted its own due diligence on all matters referred to in such documents and information, or otherwise relating to the Property.

10.    **Property "As-Is":**

10.1    NO SIDE AGREEMENTS OR REPRESENTATIONS; AS-IS PURCHASE. BUYER REPRESENTS, WARRANTS AND COVENANTS TO SELLER THAT BUYER HAS AND MAY CONTINUE TO INDEPENDENTLY AND PERSONALLY INSPECT THE PROPERTY AND IMPROVEMENTS AND THAT BUYER HAS ENTERED INTO THIS AGREEMENT BASED UPON ITS RIGHTS TO MAKE SUCH PERSONAL EXAMINATION AND INSPECTION. BUYER AGREES THAT BUYER WILL ACCEPT THE PROPERTY, IN ITS THEN CONDITION **AS-IS AND WITH ALL ITS FAULTS,** INCLUDING

- 10 -

WITHOUT LIMITATION, ANY FAULTS AND CONDITIONS SPECIFICALLY REFERENCED IN THIS AGREEMENT. NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF, BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO:

     (I)      THE VALUE OF THE PROPERTY;

     (II)     THE INCOME TO BE DERIVED FROM THE PROPERTY;

     (III)    THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, INCLUDING ANY DEVELOPMENT OF THE PROPERTY;

     (IV)    THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY;

     (V)     THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY;

     (VI)    THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY;

     (VII)    THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY;

     (VIII)   THE MANNER, CONDITION OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY;

     (IX)    COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATION, ORDERS OR REQUIREMENTS, INCLUDING BUT NOT LIMITED TO, THE ENDANGERED SPECIES ACT, TITLE III OF THE AMERICANS WITH DISABILITIES ACT OF 1990 OR ANY OTHER LAW, RULE OR REGULATION GOVERNING ACCESS BY DISABLED PERSONS, THE FEDERAL WATER POLLUTION CONTROL ACT, THE FEDERAL RESOURCE CONSERVATION AND RECOVERY ACT, THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, THE RESOURCES CONSERVATION AND RECOVERY ACT OF 1976, THE CLEAN WATER ACT, THE SAFE DRINKING WATER ACT, THE HAZARDOUS MATERIALS TRANSPORTATION ACT, THE TOXIC SUBSTANCE CONTROL ACT, AND REGULATIONS PROMULGATED UNDER ANY OF THE FOREGOING;

21479230\V-1

(X)  THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE PROPERTY;

(XI)  THE CONTENT, COMPLETENESS OR ACCURACY OF THE DUE DILIGENCE MATERIALS, INCLUDING ANY INFORMATIONAL PACKAGE, COST TO COMPLETE ESTIMATE OR OTHER MATERIALS PREPARED BY SELLER;

(XII)  THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY, INCLUDING ANY PLANS AND SPECIFICATIONS THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER;

(XIII)  THE CONFORMITY OF THE PROPERTY TO PAST, CURRENT OR FUTURE APPLICABLE ZONING OR BUILDING REQUIREMENTS;

(XIV)  DEFICIENCY OF ANY UNDERSHORING;

(XV)  DEFICIENCY OF ANY DRAINAGE;

(XVI)  THE FACT THAT ALL OR A PORTION OF THE PROPERTY MAY BE LOCATED ON OR NEAR AN EARTHQUAKE FAULT LINE;

(XVII)  THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY, OR

(XVIII)  WITH RESPECT TO ANY OTHER MATTER CONCERNING THE PROPERTY EXCEPT AS MAY BE OTHERWISE EXPRESSLY STATED HEREIN, INCLUDING ANY AND ALL SUCH MATTERS REFERENCED, DISCUSSED OR DISCLOSED IN ANY DOCUMENTS DELIVERED BY SELLER TO BUYER, IN ANY PUBLIC RECORDS OF ANY GOVERNMENTAL AGENCY OR ENTITY OR UTILITY COMPANY, OR IN ANY OTHER DOCUMENTS AVAILABLE TO BUYER.

BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY AND REVIEW INFORMATION AND DOCUMENTATION AFFECTING THE PROPERTY, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION MADE AVAILABLE TO BUYER OR PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION EXCEPT AS MAY OTHERWISE BE PROVIDED HEREIN.  BUYER AGREES TO FULLY AND IRREVOCABLY RELEASE ALL SUCH SOURCES OF INFORMATION AND PREPARERS OF INFORMATION AND DOCUMENTATION TO THE EXTENT SUCH SOURCES OR PREPARERS ARE SELLER OR BANK, OR THEIR EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, SERVANTS, ATTORNEYS, AFFILIATES,

21479233\V-1

PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS OR ASSIGNS FROM ANY AND
ALL CLAIMS THAT THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST
SUCH SOURCES AND PREPARERS OF INFORMATION FOR ANY COSTS, LOSS,
LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING
FROM SUCH INFORMATION OR DOCUMENTATION. SELLER IS NOT LIABLE OR
BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS,
REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE
OPERATION THEREOF, FURNISHED BY ANY OF THE FOREGOING ENTITIES AND
INDIVIDUALS OR ANY OTHER INDIVIDUAL OR ENTITY. BUYER FURTHER
ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY
LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN
"**AS-IS**" CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO
OBLIGATIONS TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS.

10.2 RELEASE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT,
BUYER AND ANYONE CLAIMING BY, THROUGH OR UNDER BUYER HEREBY
FULLY AND IRREVOCABLY RELEASES SELLER, BANK, AND THEIR EMPLOYEES,
OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, SERVANTS, ATTORNEYS,
AFFILIATES, PARENT COMPANIES, SUBSIDIARIES, SUCCESSORS AND ASSIGNS,
AND ALL PERSONS, FIRMS, CORPORATIONS AND ORGANIZATIONS ACTING ON
THEIR BEHALF (COLLECTIVELY, THE "**SELLER PARTIES**") FROM ANY AND ALL
CLAIMS THAT IT MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST ANY
SELLER PARTY FOR ANY COSTS, LOSS, LIABILITY, DAMAGE, EXPENSES,
DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATED TO ANY
CONSTRUCTION DEFECTS, ERRORS, OMISSIONS OR OTHER CONDITIONS, LATENT
OR OTHERWISE, GEOTECHNICAL AND SEISMIC, AFFECTING THE PROPERTY OR
ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION,
(1) ENVIRONMENTAL MATTERS WHICH WERE: (i) DESCRIBED OR REFERRED TO
IN THE ENVIRONMENTAL REPORT(S) OR IN ANY ENVIRONMENTAL AUDIT
OBTAINED BY BUYER; OR (ii) REASONABLY DISCOVERABLE BY PRUDENT
INVESTIGATION; OR (iii) OTHERWISE DISCLOSED BY SELLER TO BUYER OR
DISCOVERED BY BUYER AT ANY TIME PRIOR TO THE CLOSING; AND (2) THE
ITEMS DESCRIBED IN SECTION 10.1 ABOVE, AND 10.3 BELOW.

THIS RELEASE INCLUDES CLAIMS OF WHICH BUYER IS PRESENTLY
UNAWARE OR WHICH BUYER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH,
IF KNOWN BY BUYER, WOULD MATERIALLY AFFECT BUYER'S RELEASE TO
SELLER.

IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE HAS BEEN
ADJUSTED BY PRIOR NEGOTIATIONS TO REFLECT THAT ALL OF THE PROPERTY
IS SOLD BY SELLER AND PURCHASED BY BUYER SUBJECT TO THE FOREGOING.
IT IS NOT CONTEMPLATED THAT THE PURCHASE PRICE WILL BE INCREASED IF
COSTS TO BUYER ASSOCIATED WITH THE PROPERTY PROVE TO BE LESS THAN
EXPECTED NOR WILL THE PURCHASE PRICE BE REDUCED IF THE BUYER'S PLAN
FOR THE PROPERTY LEADS TO HIGHER COST PROJECTIONS.

- 13 -

10.3 Disclosures; Specific Acknowledgment Regarding Condition of Property. Buyer acknowledges and agrees to the disclosures and provisions set forth above. Additionally, and without limiting the generality of the foregoing Section 10.1, Buyer is aware that the Property and this Agreement are subject to the jurisdiction of the Bankruptcy Court.

**11.** **Title Insurance**: Prior to the Effective Date, Buyer has made arrangements with the Title Company to issue to Buyer at the Close of Escrow a 2006 ALTA Standard Coverage Owner's Policy of Title Insurance on terms and conditions acceptable to Buyer ("**Title Policy**"), at Buyer's expense.

**12.** **Costs and Expenses**: Seller will pay (in the form of a debit at Closing):

      (a)    ½ of all escrow fees and costs;

      (b)    all city and county documentary transfer taxes, if any; and

      (c)    Seller's share of prorations.

Buyer will pay:

      (a)    the premium for a standard owner's policy of title insurance;

      (b)    ½ of all escrow fees and costs;

      (c)    the cost of any survey Buyer chooses to obtain;

      (d)    all document recording charges;

      (e)    the cost of Buyer's Title Policy and mortgagee's policy, if any, and the cost of any endorsements to the Title Policy required by Buyer; and

      (f)    Buyer's share of prorations.

Buyer and Seller will each pay all legal and professional fees and fees of other consultants incurred by Buyer and Seller, respectively. Except as set forth in Section 13 below, all other normal costs and expenses will be allocated between Buyer and Seller in accordance with the customary practice in the county in which the Property is located.

**13.** **Prorations:**

13.1 Taxes and Assessments. All accrued real estate taxes and assessments on the Property, whether or not delinquent and whether or not now due and payable, will be assumed and payable by Buyer and no adjustment shall be made to the Purchase Price for the same.

13.2 Rents and Deposits. At present there are no Leases in force with respect to the Property. Therefore, there will be no prorations with respect to prepaid rents or security deposits.

13.3 Utilities. If applicable, Seller will notify all utility companies servicing the Property of the sale of the Property to Buyer and will request that such companies send Seller a

- 14 -

Case 10-20014   Doc# 588   Filed 10/25/11   Page 19 of 42

final bill for the period ending on the last day before the Close of Escrow. Buyer will notify the utility companies that all utility bills for the period commencing on the Close of Escrow are to be sent to Buyer. In addition to the Purchase Price, Buyer will pay to Seller an amount equal to the total of all utility deposits held by utility companies and Seller will assign to Buyer all of Seller's right, title and interest in any such utility deposits; provided, however, Seller reserves the right to receive a return of such utility deposits and in such event, Buyer will arrange for substitute deposits with the utility companies as may be required. If following the Close of Escrow either Buyer or Seller receives a bill for utilities or other services provided to the Property for the period in which the Close of Escrow occurred, Buyer and Seller will equitably prorate the bill, and this obligation of the parties shall survive Closing. All prorations will be made as of the date of Close of Escrow based on a 365 day year or a 30 day month, as applicable.

**14. Disbursements and Other Actions by Escrow Holder:** At the Close of Escrow, Escrow Holder will promptly undertake all of the following:

14.1 Funds. Disburse all funds deposited with Escrow Holder by Buyer in payment of the Purchase Price for the Property as follows:

(a) deliver to the Bank (or as the Bankruptcy Court may otherwise direct), the Purchase Price, less the amount of all items, costs and prorations chargeable to the account of Seller; and

(b) disburse the remaining balance, if any, of the funds deposited by Buyer to Buyer, less amounts chargeable to Buyer.

14.2 Recording. Cause the Deed and the Memorandum of Lease Assignment, if applicable, to be recorded with the County Recorder and obtain conformed copies thereof for distribution to Buyer and Seller.

14.3 Delivery of Documents to Buyer or Seller. Deliver to Buyer the FIRPTA Certificate and any other documents (or copies thereof) deposited into Escrow by Seller. Deliver to Seller any other documents (or copies thereof) deposited into Escrow by Buyer.

**15. Joint Representations and Warranties:** In addition to any express agreements of the parties contained herein, the following constitute representations and warranties of the parties each to the other:

15.1 Authority. Subject to obtaining Bankruptcy Court Approval, each party has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate this transaction.

15.2 Actions. Subject to final approval of the Bankruptcy Court having jurisdiction over Seller, all requisite action (corporate, trust, partnership, limited liability company or otherwise) has been taken by each party in connection with the entering into of this Agreement, the instruments referenced herein, and the consummation of this transaction. No further consent of any partner, shareholder, member, manager, creditor, investor, judicial or administrative body, governmental authority or other party is required.

- 15 -

15.3     Due Execution. The individuals executing this Agreement and the instruments referenced herein on behalf of each party and the partners, officers, members, managers or trustees of each party, if any, have the legal power, right, and actual authority to bind each party to the terms and conditions of those documents.

15.4     Valid and Binding. This Agreement and all other documents required to close this transaction are and will be valid, legally binding obligations of and enforceable against each party in accordance with their terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium laws or similar laws or equitable principles affecting or limiting the rights of contracting parties generally.

15.5     Prohibited Person. Neither party (i) is a Person (a "**Prohibited Person**") either listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, U.S. Department of the Treasury (the "**OFAC List**") or otherwise blocked or banned under laws, regulations or executive orders, including Executive Order No. 13224, administered by the Office of Foreign Asset Control, U.S. Department of the Treasury (collectively, the "**OFAC Rules**"), or under or pursuant to the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "**Patriot Act**"), (ii) is controlled by a Prohibited Person, (iii) is acting hereunder nor will act hereunder for or on behalf of a Prohibited Person, or (iv) is providing or will provide material, financial or technological support or other services to or in support of acts of terrorism of a Prohibited Person.

**16.     Seller's Pre-Closing Covenants:** So long as this Agreement remains in full force and effect:

(a)     Without the prior written consent of Buyer, which consent will not be unreasonably withheld or delayed, Seller will not convey any interest in the Property and will not subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters after the date of this Agreement, except as may be otherwise provided for in this Agreement or as ordered by the Bankruptcy Court, which will not be eliminated prior to the Close of Escrow.

(b)     Seller will not make any material alterations to the Property without Buyer's consent, which will not be unreasonably withheld or delayed, except in the case of an emergency, in which case Seller will promptly notify Buyer of same.

(c)     Seller will maintain the Property in substantially the same condition as of the Effective Date, ordinary wear and tear and casualty excepted, and manage the Property in accordance with Seller's established practices.

(d)     Seller will keep and perform all of the obligations to be performed by Seller under any Leases or Contracts. Seller will not enter into any contract or agreement providing for the provision of goods or services to or with respect to the Property or the operation thereof unless such contracts or agreements can be terminated without penalty by the Closing Date or upon 30 days notice, without prior written consent of Buyer, which will not be unreasonably withheld or delayed, and Seller will not enter into any new leases for any portion

21479230V-1

of the Property or extend the terms of any existing Leases without Buyer's written consent, which will not be unreasonably withheld or delayed.

## 17. Condemnation and Destruction:

17.1 Eminent Domain or Taking. If proceedings under a power of eminent domain relating to the Property or any part thereof are commenced prior to Close of Escrow, Seller will promptly inform Buyer in writing.

(a) If such proceedings involve the taking of title to all or a material interest in the Property, Buyer may elect to terminate this Agreement by notice in writing sent within 10 days of Seller's written notice to Buyer, in which case the Deposit will be returned to Buyer, and neither party will have any further obligation to or rights against the other except any rights or obligations of either party which are expressly stated to survive termination of this Agreement.

(b) If the proceedings do not involve the taking of title to all or a material interest in the Property, or if Buyer does not elect to terminate this Agreement, this transaction will be consummated as described herein and any award or settlement payable with respect to such proceeding will be paid or assigned to Buyer upon Close of Escrow.

(c) If this sale is not consummated for any reason, any condemnation award or settlement will belong to Seller.

17.2 Damage or Destruction. Except as provided in this Section, prior to the Close of Escrow the entire risk of loss of damage by earthquake, flood, landslide, fire or other casualty is borne and assumed by Seller. If, prior to the Close of Escrow, Seller becomes aware of any material damage or destruction of any part of the Improvements by earthquake, flood, landslide, fire or other casualty, Seller will promptly inform Buyer of such fact in writing and advise Buyer as to the extent of the damage.

(a) If such material damage or destruction occurs, Buyer has the option to terminate this Agreement upon written notice to Seller given not later than 5 days after receipt of Seller's written notice to Buyer advising of such material damage or destruction.

(b) For purposes hereof, "material" is deemed to be any damage or destruction to the Improvements where the cost of repair or replacement is estimated to be more than 15% of the Purchase Price of the Property and will take more than 60 days to repair.

(c) If this Agreement is so terminated, the Deposit will be forfeited, and neither party will have any further obligation to or rights against the other except any rights or obligations of either party which are expressly stated to survive termination of this Agreement.

(d) If Buyer does not elect to terminate this Agreement, Seller will reduce the Purchase Price by the value reasonably estimated by Seller to repair or restore the damaged portion of the Improvements, less any sums expended by Seller to make emergency repairs to the Improvements or the Property or otherwise protect the physical condition of the Improvements or the Property, and this transaction will close pursuant to the terms of this Agreement.

- 17 -

Case 10-20014   Doc# 588   Filed 10/25/11   Page 22 of 42

(e)     Whether or not the sale of the Property is consummated hereunder, all rights to insurance claims or proceeds in respect of damage or destruction to the Improvements occurring prior to the Close of Escrow will belong to Seller.

## 18.   Hazardous Substances:

18.1   Definitions.  For the purposes of this Agreement, the following terms have the following meanings:

(a)     "**Environmental Law**" means any law, statute, ordinance or regulation pertaining to health, industrial hygiene or the environment including, without limitation **CERCLA** (Comprehensive Environmental Response, Compensation and Liability Act of 1980) and **RCRA** (Resources Conservation and Recovery Act of 1976).

(b)     "**Hazardous Substance**" means any substance, material or waste which is or becomes designated, classified or regulated as being "toxic" or "hazardous" or a "pollutant" or which is or becomes similarly designated, classified or regulated, under any Environmental Law, including asbestos, petroleum and petroleum products.

(c)     "**Environmental Audit**" means an environmental audit, review or testing of the Property performed by Buyer or any third party or consultant engaged by Buyer to conduct such study.

18.2   Notices Regarding Hazardous Substances.  Except as disclosed in the Environmental Report(s), from the Effective Date through the Closing Date Seller will promptly notify Buyer if to the Actual Knowledge of Seller there may be any previously undisclosed Hazardous Substance on the Property, or that Seller or the Property is subject to any threatened or pending investigation by any governmental agency under any law, regulation or ordinance pertaining to any Hazardous Substance.

18.3   Environmental Release and Indemnity.  No Seller Party will be liable to Buyer, and Buyer hereby releases each Seller Party from any and all liability, for any third party claims or any other claims (including claims by Buyer) (collectively, "**Environmental Claims**") under any federal, state or local law which are attributable to any environmental condition which:

(i)     was described or referred to in the  Environmental Report(s) or in any Environmental Audit obtained by Buyer; or

(ii)    was reasonably discoverable by prudent investigation during Buyer's due diligence prior to entering into this Agreement; or

(iii)   was otherwise disclosed by Seller to Buyer or discovered by Buyer at any time prior to the Closing.

Further, Buyer agrees to indemnify, defend and hold each Seller Party harmless for, from and against any and all Environmental Claims.

- 18 -

The provisions of this Section 18.3 will survive the Close of Escrow. The provisions of this Section 18.3 are not intended to diminish in any way the release set forth in Article 10, above.

**19.     Transportation Development District.** Buyer understands that the Property is located within the Corbin Park Transportation Development District (the "**Corbin Park TDD**") approved by the City of Overland Park, Kansas (the "**City**") by Ordinance No. TDD-2753 on June 2, 2008 and related ordinances and agreements and that Seller is a party to that certain Development Agreement dated September 8, 2008 that sets forth certain rights and obligations of the parties with respect to the Corbin Park TDD (the "**TDD Development Agreement**"). Buyer has previously reviewed the TDD Development Agreement and all other documents related to the TDD Rights. At the Close of Escrow, the Bank shall waive and release and Seller shall transfer to Buyer all of their respective rights, obligations and interests related to the Corbin Park TDD, including, without limitation, all of Seller's rights, obligations and interests under the TDD Development Agreement, which may include the right to be reimbursed for costs associated with the "TDD Improvements" from revenues generated by the "**TDD Sales Tax**" and/or proceeds from the sale of "**TDD Bonds**" (as those terms are defined in the TDD Development Agreement) (collectively, the "**TDD Rights**"). However, Buyer shall be fully responsible for obtaining any approvals and/or consents required from the City of Overland Park and/or other parties to the assignment of the TDD Development Agreement, and any other document, agreement or ordinance related to the Corbin Park TDD necessary to convey Seller's rights, obligations and interests related to the Corbin Park TDD, to Buyer, and the obtaining of such approvals shall not be a condition to closing.

**20.     Notices:** All notices or other communications required or permitted hereunder must be in writing, and must be personally delivered (including by means of professional messenger service) or sent by overnight courier, to the addresses set forth in Section 1. All notices shall be deemed received on the date delivered.

**21.     Broker:** Subject to the completion of the transactions contemplated herein and the Close of Escrow, Seller will pay Seller's Broker, a commission (the "**Commission**") per terms of a separate agreement between Seller and Seller's Broker. Buyer represents and warrants to Seller, that no broker or finder has been engaged by Buyer in connection with any of the transactions contemplated by this Agreement, or to its knowledge is in any way connected with any of such transactions. Buyer will indemnify, save harmless and defend Seller from any liability, cost, or expense arising out of or connected with any claim for any commission or compensation made by any person or entity claiming to have been retained or contacted by Buyer in connection with this transaction. Seller will indemnify, save harmless and defend Buyer from any liability, cost, or expense arising out of or connected with any claim for any commission or compensation made by any person or entity claiming to have been retained or contacted by Seller in connection with this transaction, other than Seller's Broker. This indemnity provision will survive the Closing or any earlier termination of this Agreement.

**22.     Entry:** Buyer and Buyer's representatives, agents and designees will have the right, at reasonable times and upon at least 48 hours prior notice to Seller, to enter upon the Property in connection with Buyer's proposed purchase of the Property, solely to verify that the condition of the Property has been maintained in accordance with Section 16 above.

- 19 -

Case 10-20014    Doc# 588    Filed 10/25/11    Page 24 of 42

## 23. Legal and Equitable Enforcement of this Agreement:

23.1 Waiver of Specific Performance and Lis Pendens. In the event the Close of Escrow and the consummation of the transaction contemplated by this Agreement do not occur by reason of material default by Seller or if Seller is unable to obtain the binding Bankruptcy Court Approval (as defined above), including the Sale Order, within sixty (60) days of the Effective Date, then Buyer may terminate this Agreement and Buyer as its sole remedy will be entitled to the return of the Deposit. As material consideration to Seller's entering into this Agreement with Buyer, Buyer waives any right: (a) to pursue an action for the specific performance of this Agreement; and (b) to record or file a notice of lis pendens or notice of pendency of action or similar notice against any portion of the Property.

23.2 Default by Buyer. In the event the Close of Escrow and the consummation of the transaction contemplated by this Agreement do not occur by reason of material default by Buyer, Seller shall be entitled to the retain the Deposit as liquidated damages and not as a penalty as Seller's sole remedy.

**24. Assignment:** Buyer will not assign this Agreement without obtaining Seller's prior written consent, which consent may be withheld by Seller in its sole and absolute discretion for any reason whatsoever; provided, however, Buyer may assign this Agreement to an affiliate of Buyer without obtaining Seller's prior consent. Any attempted assignment without Seller's prior written consent except as expressly provided herein will, at Seller's option, be voidable and constitute a material breach of this Agreement. If Seller consents to an assignment, or Buyer makes a permitted assignment without Seller's consent, the assignment will not be effective against Seller until Buyer delivers to Seller a fully executed copy of the assignment instrument, which instrument must be satisfactory to Seller in both form and substance and pursuant to which the assignee assumes and agrees to perform for the benefit of Seller the obligations of Buyer under this Agreement, and pursuant to which the assignee makes the warranties and representations required of Buyer under this Agreement and such other representations and warranties as Seller may reasonably require. Any such assignment will not release Buyer from any of its obligations under this Agreement.

## 25. Miscellaneous:

25.1 Counterparts. This Agreement may be executed in counterparts. The parties agree to recognize electronic signatures with respect to this Agreement and the actions, documentation and transactions called for herein.

25.2 Partial Invalidity. If any term or provision of this Agreement will be deemed to be invalid or unenforceable to any extent, the remainder of this Agreement will not be affected thereby, and each remaining term and provision of this Agreement will be valid and be enforced to the fullest extent permitted by law.

25.3 Possession of the Property. Seller will deliver possession of the Property to Buyer upon the Close of Escrow, subject to the right of tenants, if any.

25.4 Waivers. No waiver of any breach of any covenant or provision contained herein will be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant

- 20 -

or provision contained herein. No extension of time for performance of any obligation or act will be deemed an extension of the time for performance of any other obligation or act except those of the waiving party, which will be extended by a period of time equal to the period of the delay.

25.5    Successors and Assigns.    This Agreement is binding upon and inures to the benefit of the permitted successors and assigns of the parties hereto.

25.6    Professional Fees.    In the event of the bringing of any action or suit by a party hereto against another party hereunder by reason of any breach of any of the covenants, agreements or provisions on the part of the other party arising out of this Agreement, then in that event the prevailing party, as determined by the court, will be entitled to have the recovery of and from the other party all costs and expenses of the action or suit, actual attorneys' fees, witness fees and any other professional fees resulting therefrom.

25.7    Entire Agreement.    This Agreement (including all Exhibits attached hereto) constitutes the entire contract between the parties hereto with respect to the subject matter hereof and may not be modified except by an instrument in writing signed by the party to be charged.

25.8    Time of Essence.    Seller and Buyer hereby acknowledge and agree that time is strictly of the essence with respect to each and every term, condition, obligation and provision hereof.

25.9    Construction.    This Agreement has been prepared by Seller and its professional advisors and reviewed by Buyer and its professional advisers. Seller and Buyer and their respective advisors believe that this Agreement is the product of all of their efforts, that it expresses their agreement and that it should not be interpreted in favor of or against either Buyer or Seller. The parties further agree that this Agreement will be construed to effectuate the normal and reasonable expectations of a sophisticated Seller and Buyer.

25.10    Governing Law.    The parties hereto expressly agree that this Agreement will be governed by, interpreted under, and construed and enforced in accordance with the laws of the State in which the Property is located.

25.11    Wear and Tear.    Buyer specifically acknowledges that Seller will continue to use the Property in the course of its business and accepts the fact that reasonable wear and tear will occur after the date of this Agreement. Buyer specifically agrees that Seller is not responsible for repairing such reasonable wear and tear and that Buyer is prohibited from raising such wear and tear as a reason for not consummating this transaction or for requesting a reduction in the Purchase Price.

25.12    No Recordation.    No memorandum or other document relating to this Agreement will be recorded without the prior written consent of Seller.

25.13    Financing.    Buyer represents and warrants to Seller that Buyer, without the prior written consent of Seller, has not and will not obtain any financing in connection with sale of the Property from Bank or any subsidiary or affiliate of Bank.

- 21 -

Case 10-20014    Doc# 588    Filed 10/25/11    Page 26 of 42

25.14 Survival. All obligations of the parties contained herein which by their terms do not arise until after the Close of Escrow and any other provisions of this Agreement which by their terms survives the Close of Escrow, shall survive the Close of Escrow.

25.15 Not an Offer; Last Date for Submission. Seller's delivery of unsigned copies of this Agreement is solely for the purpose of review by the party to whom delivered, and neither the delivery nor any prior communications between the parties, whether oral or written, will in any way be construed as an offer by Seller, nor in any way imply that Seller is under any obligation to enter the transaction which is the subject of this Agreement. The signing of this Agreement by Buyer constitutes an offer which will not be deemed accepted by Seller unless and until Seller has signed this Agreement and delivered a duplicate original to Buyer.

25.16 Third Party Beneficiary. The parties agree that Bank is an intended, third party beneficiary of this Agreement and is entitled to rely upon all rights, representations, warranties, and covenants made by Buyer herein to the same extent as if Bank were Seller hereunder. Except with respect to Bank or as otherwise expressly stated herein, this Agreement shall be solely for the benefit of the parties and no other person or entity shall be a third party beneficiary hereof.

**[Space Below Intentionally Left Blank – Signature Page to Follow]**

.

Case 10-20014   Doc# 588   Filed 10/25/11   Page 27 of 42

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**"SELLER"**

**CORBIN PARK, LP**

By: _____

Its: _____

Dated: October 24, 2011

**"BUYER"**

**ASPEN SQUARE, INC.**, a Kansas corporation

By: _Muhl L. Slly_

Its: President

Dated: October 24, 2011

STATE OF KANSAS      )
                                        )ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this _____ day of _____, 2011, by _____, _____ of Corbin Park, LP, a Delaware limited partnership, on behalf of the limited partnership.

_____
Notary Public

STATE OF **Kansas** )
                              )ss.
COUNTY OF **Johnson** )

    The foregoing instrument was acknowledged before me this 24th day of October, 2011, by Michel Schlup, President of Aspen Square, Inc., a Kansas corporation, on behalf of the corporation.

<table>
<tr><td>

Rhonda L. Sherman<br>
Notary Public<br>
State of Kansas<br>
My Appt. Exp. _08 - 11 - 15_

</td></tr>
</table>

Rhonda L. Sherman
Notary Public

## EXHIBIT A

The land referred to in this Commitment is situated in the State of Kansas, Johnson County, and is described as follows:

ALL OF TRACT M, CORBIN PARK, SECOND PLAT, ALL OF TRACT Q, CORBIN PARK, THIRD PLAT, ALL OF TRACTS R AND S, CORBIN PARK, FIFTH PLAT, ALL OF LOT 18 AND TRACT U, CORBIN PARK, SIXTH PLAT, ALL OF LOT 19 AND TRACT V, CORBIN PARK, SEVENTH PLAT, ALL OF LOT 20, CORBIN PARK, EIGHTH PLAT, ALL OF LOT 22, CORBIN PARK, NINTH PLAT, ALL OF LOTS 25 AND 27, CORBIN PARK, ELEVENTH PLAT, ALL OF LOT 30, AND TRACT B, CORBIN PARK, FOURTEENTH PLAT, ALL OF LOT 5, CORBIN PARK, SEVENTEENTH PLAT AND ALL OF LOT 6, CORBIN PARK, EIGHTEENTH PLAT, TOGETHER WITH AN UNPLATTED PORTION OF LAND, ALL LYING IN THE NORTHWEST QUARTER OF SECTION 32, TOWNSHIP 13 SOUTH, RANGE 25 EAST, IN THE CITY OF OVERLAND PARK, JOHNSON COUNTY, KANSAS, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF THE NORTHWEST QUARTER OF SECTION 32, TOWNSHIP 13 SOUTH, RANGE 25 EAST; THENCE SOUTH 1° 54' 06" EAST ALONG THE WEST LINE OF THE NORTHWEST QUARTER OF SAID SECTION 32 A DISTANCE OF 1100.52 FEET TO A POINT; THENCE NORTH 88° 05' 54" EAST A DISTANCE OF 301.71 FEET TO A POINT ON THE WEST LINE OF TRACT M, CORBIN PARK, SECOND PLAT, THE POINT OF BEGINNING; THENCE NORTH 1° 54' 22" WEST ALONG THE WEST LINE OF SAID TRACT M A DISTANCE OF 170.31 FEET TO A POINT; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE WEST LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 500.00 FEET, THROUGH A CENTRAL ANGLE OF 7° 23' 54", AN ARC DISTANCE OF 64.56 FEET TO A POINT; THENCE NORTH 9° 18' 16" WEST ALONG THE WEST LINE OF SAID TRACT M A DISTANCE OF 279.78 FEET A POINT; THENCE IN A NORTHEASTERLY DIRECTION ALONG THE WESTERLY AND NORTHERLY LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 265.00 FEET, THROUGH A CENTRAL ANGLE OF 104° 47' 43", AN ARC DISTANCE OF 484.69 FEET TO A POINT; THENCE SOUTH 84° 30' 33" EAST ALONG THE NORTH LINE OF SAID TRACT M A DISTANCE OF 234.67 FEET TO A POINT; THENCE IN A SOUTHEASTERLY DIRECTION ALONG THE NORTH LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 1200.00 FEET, THROUGH A CENTRAL ANGLE OF 7° 23' 50", AN ARC DISTANCE OF 154.93 FEET TO A POINT; THENCE NORTH 88° 05' 37" EAST ALONG THE NORTH LINE OF SAID TRACT M A DISTANCE OF 758.18 FEET TO A POINT; THENCE IN A NORTHEASTERLY DIRECTION ALONG THE NORTH LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 250.00 FEET, THROUGH A CENTRAL ANGLE OF 12° 26' 40", AN ARC DISTANCE OF 54.30 FEET TO A POINT; THENCE NORTH 75° 38' 57" EAST ALONG THE NORTH LINE OF SAID TRACT M A DISTANCE OF 128.21 FEET TO A POINT; THENCE IN A NORTHEASTERLY DIRECTION ALONG THE NORTH LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 884.76 FEET, THROUGH A CENTRAL ANGLE OF 10° 56' 23", AN ARC DISTANCE OF 168.93 FEET TO A POINT; THENCE NORTH 86° 35' 20" EAST ALONG THE NORTH LINE OF SAID TRACT M A DISTANCE OF 63.01 FEET TO A POINT; THENCE IN A SOUTHEASTERLY DIRECTION ALONG THE NORTHERLY AND EASTERLY LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 150.12 FEET, THROUGH A CENTRAL ANGLE OF 91° 30' 18", AN ARC DISTANCE OF 239.75 FEET TO A POINT; THENCE SOUTH 1° 54' 22" EAST ALONG THE EAST LINE OF SAID TRACT M A DISTANCE OF 196.72 FEET TO A POINT; THENCE IN A

This commitment is invalid unless the insuring provisions and Schedules A and B are attached.

SOUTHEASTERLY DIRECTION ALONG THE EAST LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 400.00 FEET, THROUGH A CENTRAL ANGLE OF 13° 44' 53", AN ARC DISTANCE OF 95.98 FEET TO A POINT; THENCE SOUTH 15° 39' 14" EAST ALONG THE EAST LINE OF SAID TRACT M A DISTANCE OF 6.97 FEET TO A POINT; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE EASTERLY LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 75.00 FEET, THROUGH A CENTRAL ANGLE OF 77° 27' 20", AN ARC DISTANCE OF 101.39 FEET TO THE POINT ON THE EASTERLY LINE OF TRACT Q, CORBIN PARK, THIRD PLAT; THENCE SOUTH 28° 11' 54" EAST ALONG THE EASTERLY LINE OF SAID TRACT Q AND THE NORTHERLY LINE OF LOT 22, CORBIN PARK, NINTH PLAT A DISTANCE OF 26.84 TO A POINT; THENCE IN A NORTHEASTERLY DIRECTION ALONG THE NORTH LINE OF SAID LOT 22 AND ALONG A CURVE TO THE RIGHT WHOSE INITIAL TANGENT BEARS NORTH 67° 27' 08" EAST, HAVING A RADIUS OF 188.00 FEET, THROUGH A CENTRAL ANGLE OF 13° 07' 47", AN ARC DISTANCE OF 43.08 FEET TO A POINT; THENCE NORTH 80° 34' 55" EAST ALONG THE NORTH LINE OF SAID LOT 22 A DISTANCE OF 75.06 FEET TO A POINT; THENCE IN A NORTHEASTERLY DIRECTION ALONG THE NORTH LINE OF SAID LOT 22 AND ALONG A CURVE TO RIGHT, HAVING A RADIUS OF 438.00 FEET, THROUGH A CENTRAL ANGLE OF 7° 30' 50", AN ARC DISTANCE OF 57.44 FEET TO A POINT; THENCE NORTH 88° 05' 45" EAST ALONG THE NORTH LINE OF SAID LOT 22 A DISTANCE OF 100.16 FEET TO THE NORTHEAST CORNER THEREOF; THENCE IN A SOUTHEASTERLY DIRECTION ALONG THE EAST LINE OF SAID LOT 22 AND ALONG A CURVE TO THE LEFT WHOSE INITIAL TANGENT BEARS SOUTH 3° 12' 14" WEST, HAVING A RADIUS OF 915.00 FEET, THROUGH A CENTRAL ANGLE OF 32° 03' 16", AN ARC DISTANCE OF 511.90 FEET TO A POINT; THENCE SOUTH 28° 51' 02" EAST ALONG THE EAST LINE OF SAID LOT 22 A DISTANCE OF 11.06 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF 138TH STREET AS ESTABLISHED BY THE FINAL PLAT OF CORBIN PARK, FIRST PLAT; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE NORTH RIGHT OF WAY LINE OF 138TH STREET AND ALONG A CURVE TO THE RIGHT WHOSE INITIAL TANGENT BEARS SOUTH 61° 22' 46" WEST, HAVING A RADIUS OF 610.00 FEET, THROUGH A CENTRAL ANGLE OF 18° 06' 31", AN ARC DISTANCE OF 192.80 FEET TO A POINT; THENCE SOUTH 79° 29' 17" WEST ALONG THE NORTH RIGHT OF WAY LINE OF 138TH STREET A DISTANCE OF 425.28 FEET TO A POINT; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE NORTH RIGHT OF WAY LINE OF 138TH STREET AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 635.00 FEET, THROUGH A CENTRAL ANGLE OF 37° 41' 13", AN ARC DISTANCE OF 417.68 FEET TO A POINT; THENCE SOUTH 41° 48' 04" WEST ALONG THE NORTHERLY RIGHT OF WAY LINE OF 138TH STREET A DISTANCE OF 2.49 FEET TO THE EASTERNMOST CORNER OF TRACT F, CORBIN PARK, SECOND PLAT; THENCE NORTH 48° 11' 56" WEST ALONG THE NORTHEASTERLY LINE OF SAID TRACT F A DISTANCE OF 30.54 FEET TO A POINT; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE NORTHEASTERLY LINE OF SAID TRACT F AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 962.00 FEET, THROUGH A CENTRAL ANGLE OF 1° 17' 34", AN ARC DISTANCE OF 21.71 FEET TO A POINT; THENCE NORTH 46° 54' 22" WEST ALONG THE NORTHEASTERLY LINE OF SAID TRACT F A DISTANCE OF 131.12 FEET TO A POINT; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE NORTHEASTERLY LINE OF SAID TRACT F AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 962.00 FEET, THROUGH A CENTRAL ANGLE OF 2° 48' 33", AN ARC DISTANCE OF 47.17 FEET TO A POINT; THENCE NORTH 20° 41' 18" EAST ALONG THE NORTHEASTERLY LINE OF SAID TRACT F A DISTANCE OF 12.67 FEET TO THE SOUTHERNMOST CORNER OF SAID TRACT Q; THENCE NORTH 46° 54' 22" WEST ALONG THE WESTERLY LINE OF SAID TRACT Q A DISTANCE OF 24.00 FEET TO A POINT ON THE SOUTH LINE OF SAID TRACT M; THENCE SOUTH 43° 05' 38" WEST ALONG THE SOUTH LINE OF SAID TRACT M A DISTANCE OF 31.56 FEET TO A POINT; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE SOUTH LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 250.00 FEET, THROUGH A CENTRAL ANGLE OF 45° 00' 00", AN ARC DISTANCE OF 196.35 FEET TO A POINT; THENCE SOUTH 88° 05' 38" WEST ALONG THE SOUTH LINE OF SAID TRACT M A DISTANCE OF 506.35 FEET TO A POINT; THENCE IN A SOUTHWESTERLY DIRECTION ALONG THE SOUTH LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 500.00 FEET, THROUGH A CENTRAL ANGLE OF 20° 30' 21", AN ARC DISTANCE OF 178.95 FEET TO A POINT; THENCE SOUTH 67° 35' 17" WEST ALONG THE SOUTH LINE OF SAID TRACT M A DISTANCE OF 91.72 FEET TO A POINT; THENCE IN A NORTHWESTERLY

This commitment is invalid unless the insuring provisions and Schedules A and B are attached.

DIRECTION ALONG THE SOUTHERLY AND WESTERLY LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 170.00 FEET, THROUGH A CENTRAL ANGLE OF 119° 42' 52", AN ARC DISTANCE OF 355.20 FEET TO A POINT; THENCE NORTH 7° 18' 09" EAST ALONG THE WEST LINE OF SAID TRACT M A DISTANCE OF 96.50 FEET TO A POINT; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE WEST LINE OF SAID TRACT M AND ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 500.00 FEET, THROUGH A CENTRAL ANGLE OF 15° 12' 40", AN ARC DISTANCE OF 132.74 FEET TO A POINT; THENCE NORTH 7° 54' 30" WEST ALONG THE WEST LINE OF SAID TRACT M A DISTANCE OF 28.66 FEET TO A POINT; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE WEST LINE OF SAID TRACT M AND ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 500.00 FEET, THROUGH A CENTRAL ANGLE OF 6° 00' 09", AN ARC DISTANCE OF 52.38 FEET TO THE POINT OF BEGINNING, EXCEPT THE FOLLOWING PLATTED AS: ALL OF TRACT M, CORBIN PARK, SECOND PLAT, ALL OF TRACT Q, CORBIN PARK, THIRD PLAT, ALL OF LOT 17 ALL OF TRACTS R AND S, CORBIN PARK, FIFTH PLAT, ALL OF LOT 18 AND TRACT U, CORBIN PARK, SIXTH PLAT, ALL OF LOT 19 AND TRACT V, CORBIN PARK, SEVENTH PLAT, ALL OF LOT 20, CORBIN PARK, EIGHTH PLAT, ALL OF LOT 22, CORBIN PARK, NINTH PLAT, ALL OF LOTS 25, 26 AND 27, CORBIN PARK, ELEVENTH PLAT, ALL OF LOTS 28 AND 30, AND TRACT B, CORBIN PARK, FOURTEENTH PLAT, ALL OF LOT 5, CORBIN PARK, SEVENTEENTH PLAT AND ALL OF LOT 6, CORBIN PARK, EIGHTEENTH PLAT AND EXCEPT ANY OTHER PART USED OR DEDICATED FOR STREETS, ROADS OR PUBLIC RIGHTS OF WAY.

This commitment is invalid unless the insuring provisions and Schedules A and B are attached.

Case 10-20014   Doc# 588   Filed 10/25/11   Page 32 of 42

## EXHIBIT B

## FORM OF DEED

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

_____

_____

Attention: _____

MAIL TAX STATEMENTS TO:
Same as above

_____
(Above Space For Recorder's Use Only)

This Special Warranty Deed is made and entered into as of this _____ day of _____,
2011, by and between CORBIN PARK, LP, a Delaware limited partnership (hereinafter called
"Grantor"), whose address is _____ _____, and
_____ _____, whose address is

_____
(hereinafter called "Grantee").

WITNESSETH, that, Grantor, for and in consideration of the sum of Ten Dollars
($10.00) and other valuable consideration paid to Grantor by Grantee, the receipt and sufficiency
of which are hereby acknowledged, does hereby SELL and CONVEY unto Grantee the
following described parcel of land lying, being, and situated in the County of Johnson and State
of Kansas, to wit: _____

_____
_____ (the "Property"), free and
clear of all mortgages and mechanic's lien claims, but subject to _____
(collectively, the "Permitted Encumbrances");

TO HAVE AND TO HOLD the Property, together with all and singular the rights and
appurtenances thereto in anywise belonging unto Grantee and to its successors and assigns,
forever, and Grantor shall and will warrant and defend the title to the Property unto Grantee and
its successors and assigns forever against the lawful claims of all persons claiming by, through
and under Grantor, but none other, subject only to the general taxes for the calendar year 2010
and thereafter, special taxes becoming a lien after the date of this deed, and the Permitted
Encumbrances.

**IN WITNESS WHEREOF,** Grantor has caused these presents to be signed as of the day and year first above written.

Corbin Park, LP

By: _____

Title: _____

## ACKNOWLEDGMENT

STATE OF _____ )
                                  )ss.
COUNTY OF _____   )

On _____, before me _____
                     , personally appeared _____
_____, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said
County and State                              [SEAL]

21479230\V-1

## EXHIBIT C

### Seller's FIRPTA Affidavit

#### CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by Corbin Park, LP ("**Transferor**"), the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust and foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. Transferor's U.S. employer identification number is 94-1687665; and

3. Transferor's office address is _____, Overland Park, Kansas _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign the document on behalf of the Transferor.

CORBIN PARK, LP

By: _____

Title: _____

## EXHIBIT D

### BILL OF SALE

      For good and valuable consideration, the receipt of which is hereby acknowledged, CORBIN PARK, LP ("**Seller**") does hereby sell, transfer, and convey to: _____("**Buyer**"), all Personal Property of Seller, if any, located on and used in connection with the operation of the improvements on the real property located in the City of Overland Park, County of Johnson, State of Kansas, as more particularly described on Exhibit A attached hereto, except for the following items:

                "NONE"_____

_____

_____

_____

_____

      For purposes hereof, the term "Personal Property" shall mean the equipment, furniture and fixtures and other personal property, if any, which are actually owned by Seller and located on the real property, Seller's marketing brochures and similar materials, and Seller's intellectual property including copyrights, internet domain rights and related website rights, trademarks and trade names used in connection with the real property. Buyer accepts such Personal Property free and clear of any and all liens and encumbrances, and in its "AS-IS" condition and "WITH ALL FAULTS". Seller specifically disclaims all express or implied warranties regarding the existence or condition of, or title to, such Personal Property, including without limitation the implied warranties of merchantability and suitability for a particular purpose.

      Date:_____, 2011

                               CORBIN PARK, LP

                               By: _____
                               Title: _____

## EXHIBIT A TO BILL OF SALE

"NONE"

21479230\V-1

## EXHIBIT E

## ASSIGNMENT AND ASSUMPTION
## OF CONTRACTS AND WARRANTIES

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, CORBIN PARK, LP, herein referred to as "**Assignor**"), hereby assigns, transfers and conveys to _____, (herein referred to as "**Assignee**"), all contracts (the "**Contracts**") described on Schedule 1 attached, and all warranties (the "Warranties") described on Schedule 2 attached affecting that certain real property in the City of Overland Park, County of Johnson, State of Kansas (the "**Property**"), commonly known as Corbin Park and more particularly described in Exhibit A attached hereto.

Assignee hereby assumes and agrees to keep, perform and fulfill all of Assignor's obligations under the Contracts which are required to be kept, performed and fulfilled by Assignor thereunder, arising from and after the date on which a deed of the Property from Assignor to Assignee is recorded (the "Closing Date"). Assignee assumes no liability with respect to the Contracts which occurred prior to the Closing Date.

The covenants and warranties contained herein will survive the closing of the purchase and sale of the Property to which this Assignment relates, and such covenants and warranties will not be deemed merged in the deed delivered by Assignor to Assignee.

This Assignment will be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

IN WITNESS WHEREOF, the undersigned have executed the within instrument as of _____, 2011.

ASSIGNOR:          CORBIN PARK, LP

By: _____
Title: _____

ASSIGNEE:          _____

EXHIBIT A TO ASSIGNMENT AND ASSUMPTION

21479220V-1

Schedule 1 - Contracts

21479230\V-1

Schedule 2 - Warranties

21479230\V-1